1    HONORABLE KYMBERLY K. EVANSON

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT
9                          WESTERN DISTRICT OF WASHINGTON
                                        AT SEATTLE
10

11   REC ROOM, INC.,
                                                 Case No. 2:23-cv-01586-KKE
12                  Plaintiff,
                                                 DECLARATION OF DON McGOWAN IN
13          v.                                   SUPPORT OF PLAINTIFF'S RESPONSE TO
                                                 THE COURT'S APRIL 1 ORDER TO SHOW
14   M.Z,                                        CAUSE

15                  Defendants.

16          I, Don McGowan, declare and state as follows:

17          1.      I am an attorney with Kamerman, Uncyk, Soniker & Klein, P.C., counsel to

18   Plaintiff Rec Room. I am licensed in both Washington State, WSBA # 48790, and the Canadian

19   province of Quebec Bar # 201799-7. I am over 18 years old and make this declaration based on

20   my personal knowledge of the facts relayed herein, and could and would testify competently to

21   the facts set forth herein if called to do so.

22

23          2.      British Columbia law permits minors to be sued when they commit actionable

24   wrongs.

25          3.      Attached hereto as **Exhibit 1** is the decision in *Hatfield et al. v. Pearson et al.*,

26   1956 CanLII 307 (BC SC), 1 DLR (2d) 745.

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

4.      Attached hereto as **Exhibit 2** is the decision in *R. v J.P.M.*, 1996 CanLII 8701 (NS CA).

5.      Attached hereto as **Exhibit 3 is** British Columbia's Infants Act.

6.      Attached hereto as **Exhibit 4** is British Columbia's Age of Majority Act.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed this 17th day of April, 2024, at Edmonds, WA.

*/s/ Don McGowan*

DECLARATION OF DON McGOWAN - 2
(Case No. 2:23-cv-01586-KKE)

4854-0726-4952.1

CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using

the CM/ECF system which will send notification of such filing to the attorneys of record for the

parties and to the following:

**Defendant M.Z.**
c/o Olga Plotnikova
Email: oplotnikova@gmail.com

(Per Jan. 25, 2024 agreement to accept email service)

DATED this 19th day of April, 2024.


*/s/ Kristin Martinez Clark*
Kristin Martinez Clark

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

# EXHIBIT 1

HATFIELD et al. v. PEARSON et al.

*British Columbia Supreme Court, Lett C.J.S.C. February 3, 1956.*

1956 CanLII 307 (BC SC)

1956 CanLII 307 (BC SC)

*J. S. Aikins* and *J. P. van der Hoop,* for plaintiffs.

*A. D. C. Washington,* for defendants.

LETT C.J.S.C.:—This action arose out of the discharge of a rifle on January 21, 1954, in the residence of the defendants in Penticton, British Columbia.

The infant plaintiff, Glendine Roberta Hatfield, aged 14½ years, a school-girl, had been invited by telephone by the infant defendant, David John Pearson, then 13½ years of age, to the residence of the defendants to see some animal pictures which the infant defendant was planning to give to her. The boy's parents were not at home at the time.

The infant defendant had obtained possession of a .22 calibre automatic rifle, the property of his father, and one round of ammunition, and had loaded the rifle with the intention of shooting it off in the basement. While he was in the basement the infant plaintiff arrived at the back door of the residence and was met at the door by the infant defendant with the loaded rifle in his hand. The infant plaintiff entered the house and was followed down the hall to a bedroom by the infant defendant, carrying the loaded rifle without the safety catch having been placed in the "safe" position.

The infant defendant stated in evidence — and I have no reason to doubt his statement—that, while the infant plaintiff was looking at the pictures on the bed, he, still holding the loaded rifle in his hand by the trigger guard and without the safety catch on, went to a cupboard in the bedroom and, "When I turned around the gun went off as I was closing the cupboard door".

The bullet entered the spine of the infant plaintiff and resulted in a complete permanent paralysis of all muscles below the level of the injury in the region of the first lumbar vertebra.

As to the means whereby the infant defendant obtained possession of the rifle and ammunition, I am satisfied that the main facts are as follows. The rifle was purchased by the adult defendant, father of the infant defendant, (hereafter sometimes referred to as Pearson Senior) in July, 1953, and was kept in the basement of his residence. It hung on two nails driven into a beam. The bottom of the nails was at a height of 7 ft., 1½ ins. from the floor. At the time in question, the infant defendant was approximately 4 ft., 6 ins., in height. He was unable to reach the rifle from the floor, but it was readily ac-

cessible to him from an apple-box, which he placed on the floor and upon which he stood to take the rifle down from the beam. The ammunition for the gun was kept in a small cardboard package in the rear corner of a drawer in the kitchen of the house. The drawer itself was more or less of a ''catch-all'', such as might be found in any kitchen, and was not locked. In front of the small cardboard package container were several other cardboard boxes, containing miscellaneous household articles.

The infant defendant knew where both the rifle and the ammunition were kept, and his father was aware that his son had this knowledge.

For approximately a year prior to the shooting the infant defendant was the owner of a BB gun purchased with his own money and by permission of his father.

Prior to the shooting of the infant plaintiff, Pearson Senior had given some instruction to his son in the use of the .22 calibre rifle on four occasions. The first time he showed the rifle to the boy and explained that it was of a different type from the BB gun and was more dangerous. He showed the boy the mechanism of the loading and discharge features, and also the safety features, and warned him that he must never touch the gun under any circumstances unless he, the father, was present. He said, in evidence, that the son promised at that time to obey these instructions. The father fired some shots on this occasion, and the son was permitted to fire one, and possibly two, shots.

On the second occasion, on the Green Mountain Road, the father loaded the gun for the son and the son shot a crow. On that occasion the father again warned the son to be careful, and explained to him the distance a bullet from the gun would travel.

On the third occasion, returning from Keremos sometime prior to the accident, the father permitted his son to fire two or three shots. While walking over some rocks, he states, he warned the son to be careful and asked if the safety catch were on. On this occasion the father states he believes the safety catch was released by the boy and the boy fired two or three shots. The boy's recollection was that on this occasion his father had told him about the safety catch.

The fourth occasion was in the basement of the defendant's residence, towards the late fall of 1953. At this time Pearson Senior's brother and his sons were present. The use of the weapon was explained to each boy and they were taught how

1956 CanLII 307 (BC SC)

to hold and fire the gun.   It is Pearson Senior's recollection
that the safety catch mechanism was shown to them and that
each boy fired one shot on this occasion.

From a summary of the evidence I would conclude that the
infant defendant fired the weapon seven or eight times in all.

Pearson Senior stated that his son had never talked much
about guns and his main hobbies were matters other than
weapons.   He found his boy to be normally obedient, but there
was one occasion on which the son had taken the .22 calibre
weapon from its place on the beam in the basement and fired off
one shot on New Year's Eve without the knowledge or per-
mission of his parents.   Pearson Senior learned of this dis-
obedience only after the shooting which is the subject of this
action.

The son had previously been instructed by Pearson Senior in
the use of his BB gun.   He had warned his son to be careful
of it and that it was dangerous instrument.   He had been cau-
tioned not to use it in the neighbourhood of the residence and
that he must get the permission of his father or mother before
using it.   He had permission to take the gun to the yard of
the plaintiff, where he was accustomed to play with the son
of the adult plaintiff.   The father stated that the son had
never to his knowledge disobeyed any instructions given to him
regarding the BB gun.   The BB gun had no safety mechanism.

Pearson Senior also gave evidence that his son did not have
permission to use the rifle on January 21st and that he had
been told never to touch the shells.

In cross-examination Pearson Senior stated that he knew a
gun is an attraction to young boys but that it was not a special
attraction to his son.   He agreed that he had told the boy that
he was not to touch the gun because he was too young, and
agreed in cross-examination that on the day of the shooting
the boy had broken "almost every known rule for the safe
handling of weapons".

During the trial I admitted, subject to objection, a second
statement given by the infant defendant to the police after
the occurence.   I attach no weight to it as evidence against the
defendant parent.   Evidence was also admitted concerning a
defect in the mechanism of the rifle discovered by the R.C.M.P.
after the shooting.   I accept the evidence of Pearson Senior
that it was not there before the occurrence and I find it has
no bearing on the issues in this case.

At the conclusion of the trial I expressed the view that from
the evidence before me I was satisfied there was no "intention"

1956 CanLII 307 (BC SC)

Case 2:23-cv-01586-KKE   Document 22   Filed 04/19/24   Page 9 of 47

1956 CanLII 307 (BC SC)

(using the word in its ordinary or colloquial sense) on the part of the infant defendant to do injury to the infant plaintiff. That view, for the purposes of the record, I now confirm.

Defendant's counsel asked me to conclude from the evidence that, insofar as the infant defendant is concerned, the occurrence was an accident. In his exhaustive analysis of the subject of the liability of infants for trespass and negligence in *Walmsley* v. *Humenick*, [1954] 2 D.L.R. 232, my learned brother Clyne J. considered the defence of inevitable accident. At pp. 251-2 of that judgment he states:

''The result of a recent analysis of the authorities on the subject of inevitable accident by Egbert J. in *Robinson* v. *Carter*, [1950] 2 W.W.R. 1077, is that in order to sustain the defence of inevitable accident the defendant must show that the accident arose from something which was not produced by him or under his control and that the resulting damage to the plaintiff could not have been avoided by any such precautions as a reasonably careful man in such a situation would take. See also *Honan* v. *McLean*, [1953] 3 D.L.R. 193.

''A much heavier onus is cast upon a defendant seeking to set up a defence of inevitable accident than upon one who merely endeavours to prove lack of negligence, that is to say, want of reasonable care. Lord Esher M.R. in *The 'Albano'*, [1892] P. at p. 429, says that the distinction between inevitable accident and the case of mere lack of negligence is well known. He goes on to say: 'There is the law laid down by the Court, and that only leaves open this — What is the proper definition of inevitable accident? To my mind these cases shew clearly what is the proper definition of inevitable accident as distinguished from mere negligence—that is a mere want of reasonable care and skill. In my opinion, a person relying on inevitable accident must shew that something happened over which he had no control, and the effect of which could not have been avoided by the greatest ·care and skill. That seems to me to be the very distinction which was taken, and was meant to be taken, between the case of inevitable accident and a mere want of reasonable care and skill.' ''

Applying the above to the facts in this case as disclosed by the evidence, I find the infant defendant could have avoided the damage to the infant plaintiff had he taken such precautions as a reasonably careful person of his age in such a situation would have taken, and that he did not exercise reasonable care and skill. He had control over what happened and the effect of it could have been avoided by not permitting the loaded weapon

1956 CanLII 307 (BC SC)

to point at a person, by making certain the safety catch had been properly applied in the safe position, or indeed by not having the loaded weapon in his hands at all when he met the infant plaintiff at the door of his house, or when he went with her to the room to which he had directed her. Accordingly, I find that the defence of inevitable accident is not a good answer to the plaintiff's claim against the infant defendant.

From watching the infant defendant while in the witness-box I came to the conclusion that he is a boy of normal intelligence and disposition and that he was frank and truthful in his statements. He showed some nervousness at times but not more than was to be expected considering the seriousness of the predicament in which he found himself and which I believe he fully realized.

Having regard to the boy's age — 13½ years — his prior experience with a BB gun, and the nature and degree of instruction received by him in the handling of the .22 calibre automatic rifle, and his intelligence, which I considered to be certainly up to average of a boy of his age, I consider that the infant defendant was capable of realizing the probable consequence of a shot being discharged from the rifle and that, notwithstanding the inadequacy of the instructions received by him, in the common phrase, he was "old enough to know better" than to carry a loaded weapon around the house, and certainly in so carrying it without having applied the safety catch. Accordingly, I find that he was negligent. His presence of mind and prompt action in obtaining assistance immediately after the occurrence is highly commendable.

It remains then to determine whether or not Pearson Senior, father of the infant defendant, was negligent, and, if so, in what did that negligence consist.

It has not been contended by counsel for the plaintiff that Pearson Senior was liable simply because he is the father of the boy.

In *Edwards* v. *Smith,* [1941] 1 D.L.R. 736 at p. 743, 56 B.C.R. 53, O'Halloran J.A. cited the definition of Lord Wright in *Caswell* v. *Powell Duffryn Associated Collieries Ltd.,* [1940] A.C. 152 at pp. 175-6, cited by Sir Lyman P. Duff C.J.C. in *R.* v. *Hochelaga Shipping & Towing Co.,* [1940], 1 D.L.R. 369 at p. 371, S.C.R. 153 at p. 156 : " 'Negligence is the breach of that duty to take care, which the law requires . . . . in regard to another's person or his property . . . . The degree of want of care which constitutes negligence must vary with the circumstances . . . . It is not a matter of uniform standard. It may

vary according to the circumstances from man to man, from place to place, from time to time. It may vary even in the case of the same man.' ''

At the same page O'Halloran J.A. goes on to say: ''The appellant's responsibility for what the boy did depends upon whether he took reasonable precautions to prevent the boy using the gun.''

The precautions taken by Pearson Senior to prevent the boy using the gun at all consisted of:

(1)  Placing the rifle on nails driven into a beam in the basement out of reach of the boy but accessible to him by the simple expedient of standing upon a box.

(2)  Placing the ammunition in a drawer in the kitchen located on the main floor of the house in a place separate from the weapon but known and readily accessible to the boy.

(3)  Prohibiting the boy from touching the gun under any circumstances unless he, the father, was present.

(4)  Obtaining from the boy a promise to obey these instructions.

In *Donaldson* v. *McNiven,* [1952] 1 All E.R. 1213 at p. 1216, Pearson J. said: ''An air rifle is not, in my opinion, a dangerous thing per se, in the sense that a savage animal or poison or fire is a dangerous thing per se. It is, however, potentially dangerous in the sense that it may cause injury if negligently used, and a parent is negligent if he allows his son aged thirteen to have an air rifle and does not take any precautions which are reasonably necessary in the circumstances to preclude the dangerous use of it.''  [Affirmed C.A. [1952] 2 All E.R. 691.]

Accordingly, it would appear that the responsibility of the parent depends not only on whether he took reasonable precautions to prevent the boy using the gun at all, but also upon the precautions which are reasonably necessary in the circumstances to preclude the dangerous use of it.

In this case the precautions to preclude the dangerous use of the weapon taken by the father consisted of:

(1)  Instructions in the use, handling and firing of the .22 calibre weapon, given on four occasions to the extent which I have outlined in detail above. It is to be noted that on the first of the four occasions the father showed the son the safety features. On the second occasion there was no instruction regarding the safety catch. On the third occasion the father asked if the safety catch was on and the boy released it. On the fourth occasion the son, with the other boys, was shown the

1956 CanLII 307 (BC SC)

safety catch and given some instructions regarding safety precautions.

(2) Giving the boy instructions and allowing him to gain experience in the handling of a BB gun before introducing him to the use of a .22 calibre rifle.

(3) Placing the ammunition in a place separate from the weapon.

These precautions, counsel for the defendant submitted, are ample to satisfy the requirements of reasonableness in the sense that they show the father was exercising the same degree of care that the average reasonable man would exercise in such circumstanes.

From the evidence I have concluded that the precautions taken did not meet that standard of reasonableness required in dealing with a dangerous weapon such as a rifle.

In my opinion the instructions in the use of fire-arms given to any person inexperienced in their handling and use, must vary with the capability of the person receiving such instructions. Because a person has received some instruction in the loading and firing of a weapon, it is not reasonable to assume that he is competent to handle the weapon safely and without possible damage to other persons. The instruction must cover the proper safe method of loading, unloading and carrying the weapon, and particularly those elementary precautions to be taken, such as applying the safety device of the weapon, and of not permitting a loaded weapon to be pointed at a human being, whether or not the safety catch has been applied.

Such instructions to a novice, particularly a boy of $13\frac{1}{2}$ years of age, cannot be said to be adequate or to have complied with the standard of reasonableness required unless and until the person giving the instructions has satisfied himself that the person receiving the instructions comprehends them, appreciates the importance of observing them, and is reasonably proficient in putting them into practice.

Pearson Junior, on cross-examination, stated that on the occasion of the last instruction from his father he was told that he was too young to touch the gun, and that when he got older he would be given further instructions.

The fact that the father had not removed the restrictions upon the use of the weapon by the boy would indicate that he himself felt his son was not sufficiently trained in its use to be allowed to handle or use it except under supervision.

While access to the rifle in itself might not constitute negligence on the part of Pearson Senior, I consider that in leaving

1956 CanLII 307 (BC SC)

both the rifle and the ammunition accessible to the boy, under the circumstances in this case, Pearson Senior was negligent.

In *Starr* v. *Crone*, [1950] 4 D.L.R. 433 at p. 438, my learned brother Wilson, in considering the case of an air gun entrusted by a father to a boy 11-years old, concluded from the authorities that "it is negligence to entrust a dangerous weapon to a young boy unless it is proved: (a) That he was properly and thoroughly trained in the use of the weapon, with particular regard to using it safely and carefully; (b) that the boy was of an age, character and intelligence so that the father might safely assume the boy would apprehend and obey the instructions given him".

Counsel for the defendants pointed out that in that case the air gun was entrusted to the boy by the father, while in the case at bar the father forbade the boy to touch the gun or the ammunition and he had promised not to do so.

I think that the principles of law found applicable by my brother Wilson in *Starr* v. *Crone, supra,* are applicable to a case such as this, and that until all the elements mentioned in items (a) and (b) of the extract quoted above from the judgment of Wilson J. are proven to exist, it is negligence not only to entrust a rifle and ammunition to a young boy, but to allow them to be accessible to him without supervision.

I think it was to be expected that Pearson Senior would have taken steps to see that either the rifle or the ammunition were kept in such a place of security that both would not be accessible to tempt a boy who was not thoroughly and properly trained in the use of the weapon.

Notwithstanding that Pearson Senior did take certain precautions by way of instructions to his boy, and in placing the rifle out of reach, I have concluded that he did not take those precautions which are reasonably necessary in the circumstances to preclude the dangerous use of the rifle, and, accordingly, I find that he was negligent and that his negligence contributed to the injuries suffered by the plaintiffs.

Counsel for the defendants submitted that the father cannot be said to have been negligent because the injuries resulted from the disobedience of the son in taking down the rifle against his father's instruction, in not carrying out the instructions given to him in regard to the use of the weapon, and that the father had no reason to believe that his son would disobey him or break his promise. He referred me to *Donaldson* v. *McNiven, supra,* in which it was held that the precautions taken would have been adequate but for the "act of extreme disobedience

1956 CanLII 307 (BC SC)

and unfaithfulness and folly on the part of the son which could not reasonably have been foreseen or contemplated by his parents and was the cause of the accident''. [p. 1216]   In that case the son was 13 years of age and in the case at bar the boy was 13½ years of age.   The trial Judge found in that case that an order was given by the father to his son on at least one occasion not to use the air rifle outside the house.

In the case at bar, I consider that the disobedience of the boy, while it undoubtedly contributed to the unfortunate occurrence, cannot in itself be said to have been the cause of the accident.   The disobedience in taking the rifle down, contrary to his father's instructions, loading it, and carrying it around the house, might not have resulted in the shooting of the plaintiff had the boy been thoroughly trained in the precautions necessary to preclude the dangerous use of the weapon.

In *Edwards* v. *Smith,* [1941] 1 D.L.R. 736, the boy who fired the spring gun was 11 years old and the father had prohibited the use of the gun by the boy except in the presence of the father or mother.   O'Halloran J.A. in delivering the judgment of the majority of the Court, referring to the judgment of Martin J.A. in *Black* v. *Hunter,* [1925] 4 D.L.R. 285, 20 S.L.R. 123 said at p. 744:

''In that decision Martin J.A. in my view stated the principle by which the appellant's conduct should be measured in this case when he said at p. 396:

'' 'There can be no question but that the law requires a very high degree of care on the part of anyone who leaves anything potentially dangerous in a place where it is possible that children may meddle with it; everyone must be presumed to know that children will meddle with that which comes within their reach.'

''And *vide* also *Lynch* v. *Nurdin,* 1 Q.B. 29, 113 E.R. 1041; *Heaven* v. *Pender* (1883), 52 L.J.Q.B. 702 at pp. 705-7-9; *Williams* v. *Eady* (1893), 10 T.L.R. 41; and *Sullivan* v. *Creed,* [1904] 2 I.R. 317.''

After considering the evidence relating to the restrictions placed upon the use of the weapon by the parents, he went on to say at pp. 745-6: ''The appellant must be found liable for the girl's injuries, as he permitted a dangerous thing to come into the hands of an immature boy without control under circumstances in which he should have anticipated, as the event unfortunately proved, that harm might be done to the girl or other third party.   I say 'might' because it is not necessary that he should have foreseen exactly what happened.   One

is responsible not only for the necessary but for the reasonably probable consequences of his acts; *vide Sullivan* v. *Creed,* [1904] 2 I.R. 317, Chief Baron Palles at p. 328. The boy's negligent use of the gun in his absence was within the risk the father should have anticipated. The evidence discloses he did not take reasonable precautions to avoid that risk.''

While there is, as counsel for the defendants pointed out, a noticeable similarity in the views expressed by Pearson J. at p. 1216 in *Donaldson* v. *McNiven, supra,* and those expressed 11 years earlier by Macdonald C.J.B.C. in his dissenting judgment in *Edwards* v. *Smith, supra,* on the matter of the balance of the requirements of public safety with the requirements of individual freedom, it is to be noted that the other members of the Court of Appeal in *Edwards* v. *Smith* did not concur in the views of Macdonald C.J.B.C. and I have been unable to find any reported decision of our Courts wherein it has been indicated that the requirements of public safety should be thought less rigid now than when the decision was given in *Edwards* v. *Smith.*

Counsel for the defendants referred me to the case of *Smith* v. *Leurs* (1945), 70 C.L.R. 256, where the question of liability of parents for the torts of a child was discussed by the High Court of Australia. In that case the weapon was a shanghai, or catapult. The nature of the duty cast upon the parents in respect of a catapult, which is not dangerous *per se,* can, I think, be distinguished from the nature of the duty cast upon the parents in relation to a weapon such as a .22 calibre rifle.

The special damages of the plaintiff, P. C. Hatfield, were agreed upon (without admission of liability) by counsel at $2,526.81.

The question of general damages is one of great difficulty in a case of this nature.

The medical evidence, which was not disputed, shows that the infant plaintiff was grievously injured and, as a result, it is to be expected that there will be a complete paralysis of all muscles below the level of the injury in the region of the first lumbar vertebra, involving her lower limbs and the lower part of the body from the umbilicus down, and including loss of control of bowel and bladder function. Her legs have shrunken from 50% to 60% less than normal and, in the light of present medical knowledge, it is expected that she will remain completely paralysed below the level of the injured vertebra. She has suffered, and continues to suffer, considerable pain, and it is not expected that she will be free from pain in her legs.

1956 CanLII 307 (BC SC)

It is expected that she will suffer ''periodic'' pain in her back, which in the light of present medical knowledge, may be uncontrollable. Her future risks will be those of pressure sores and bladder infection, which may, over a period of years, threaten her kidneys. Having no movement of the leg muscles, she will not be able to walk except with the assistance of crutches and braces, and, while child-bearing may be possible, medical evidence shows that it will be extremely hazardous.

The infant plaintiff has benefited from the miracles of modern surgery and treatment and that, coupled with her plucky disposition and spirit, indicates that her future is not as dark as it might have been had she not received prompt medical assistance and rehabilitation treatment.

Prior to this unfortunate occurrence she was active in sports and had thought of becoming a physical education teacher. She now feels that she would like to work in a hospital or as a receptionist, and, having made such an excellent adjustment, her condition is not as hopeless as it might have been a few years ago. She has a strong desire to be gainfully employed and lead a useful life, and I am satisfied from the spirit and demeanour of the child that she has reasonable prospects of leading a life of satisfaction to herself, notwithstanding her grievous disability. It cannot be overlooked, however, that she will require continuous medical care and assistance, regardless of what occupation she may enter. Damages alone cannot, in any event, compensate a person fully for injuries of the nature suffered by the infant plaintiff, but, after full consideration, I assess her general damages at $37,500.

The plaintiffs are entitled also to their costs against the defendants.

*Judgment for plaintiffs.*

1956 CanLII 307 (BC SC)

# EXHIBIT 2

C.A.C. No. 121549

1996 CanLII 8701 (NS CA)

## NOVA SCOTIA COURT OF APPEAL

**Freeman, Roscoe and Flinn, JJ.A.**

**BETWEEN:**

J. P. M.

Appellant

**- and -**

HER MAJESTY THE QUEEN

Respondent

**Revised Decision:** The text of the original decision has been revised to remove personal identifying information of the parties on March 14, 2008.

Kevin A. Burke, Q.C. for the Appellant

David M. Meadows for the Respondent

Appeal Heard:          March 22, 1996

Judgment Delivered:     March 29, 1996

**THE COURT:**  The appeal is dismissed as per reasons for judgment of Roscoe, J.A.; Freeman and Flinn, JJ.A., concurring.

Publishers of this case please take note that s.38(1) of the Young Offenders Act applies and may require editing of this judgment or its heading before publication. Section 38(1) provides:

"38(1) No person shall publish by any means any report

(a) of an offence committed or alleged to have been committed by a young person, unless an order has been made under section 16 with respect thereto, or

(b) of a hearing, adjudication, disposition or appeal concerning a young person who committed or is alleged to have committed an offence

in which the name of the young person, a child or a young person aggrieved by the offence or a child or a young person who appeared as a witness in connection with the offence, or in which any information serving to identify such young person or child, is disclosed."

1996 CanLII 8701 (NS CA)

**ROSCOE, J.A.:**

This is an appeal by a young offender from convictions entered by Judge Atton on three counts of distributing infringing copies of computer software contrary to s. 42(1)(c) of the **Copyright Act**, R.S. 1985, c.C-42, which is as follows:

42.    (1)    Every person who knowingly

. . .

(c)    distributes infringing copies of any work in which copyright subsists either for the purpose of trade or to such an extent as to affect prejudicially the owner of the copyright,

. . .

is guilty of an offence and liable

. . .

(d)    on conviction on indictment, to a fine not exceeding one million dollars or to imprisonment for a term not exceeding five years or to both.

Other provisions of the **Copyright Act** relevant to this matter are:

2.    In this Act,

. . .

"literary work" includes tables, compilations, translations and computer programs;

. . .

"telecommunication" means any transmission of signs, signals, writing, images or sounds or intelligence of any nature by wire, radio, visual, optical or other electromagnetic system;

. . .

3.    (1)    For the purposes of this Act, "copyright" means the sole right to produce or reproduce the work or any substantial part thereof ... and includes the sole right

(a)    to produce, reproduce, perform or publish any translation of the work,

1996 CanLII 8701 (NS CA)

1996 CanLII 8701 (NS CA)

. . .

(f)   in the case of any literary, dramatic, musical or artistic work, to communicate the work to the public by telecommunication,

27.   (1)   Copyright in a work shall be deemed to be infringed by any person who, without the consent of the owner of the copyright, does anything that, by this Act, only the owner of the copyright has the right to do.

The three counts related to three different computer programs namely, **QEMM** Version 7.00, **WordPerfect** Version 6.0 for DOS and **Microsoft MS-DOS 6**. It was not disputed that the three programs were protected by the **Copyright Act**. Representatives of the owners of the three copyrights testified that no consent was given to the appellant to reproduce, copy or distribute their programs.

The sentences imposed on the appellant by Judge Atton consisted of a total of 18 months probation and 150 hours of community service.

The evidence disclosed that the appellant, aged 17 at the time covered by the charges in 1993, was the operator of a computer bulletin board, which allowed other computer users to connect to his computer system by modem and leave messages, collect and send e-mail, play computer games, and either upload or download shareware or non-copyrighted computer programs. Judge Atton's critical findings of fact respecting the system and the appellant's role as operator of it are as follows:

. . . As operator of the system J.P.M. was the person who organized the files and determined the areas in which each would be stored. He also monitored and reviewed the operation of the system and granted access to various areas of the bulletin board to callers. As he became more familiar with callers he would upgrade their access allowing them further entry to different areas. It appears that the most restricted area was area 20 or Hacker's Delight. This also appears to be the only area which contained commercial copyrighted protected programs. Access to this area was restricted to persons to whom J.P.M. had granted priority known as special. This allowed those persons access to commercial programs and the ability to download or copy them even though they were copyright protected. There were 16 such accesses granted, according to the evidence, by J.P.M. There was evidence that on at least three occasions that this downloading was done during a time period in question, and in documents filed there's also evidence that this was done on other occasions by other persons other than the ones that were witnesses. What J.P.M. had done was through his bulletin board made available for distribution and assisted in the distribution of the copyright programs without license from commercial producers and copyright owners of those materials. He also, on occasion personally downloaded or distributed the programs to computers belonging to third parties at a separate location. These activities were clearly in contravention

of the licensing agreement, and I'm satisfied, the copyrights of the producers of the materials in which were made known to purchasers of the legal copies when purchased. This action was clearly prejudicial to the owners of the copyright in that they were deprived of control over their product which they required to ensure quality and also interferes with a legitimate commercial distribution and sale of the product for profit . . .

On the issue of the appellant's **mens rea**, Judge Atton said:

. . . J.P.M., in his evidence, admitted to knowledge of all the elements of the offence. He admitted doing what the Crown over a period of two and a half days had to call witnesses to allege that he did. And further he admitted to knowledge of the licensing agreement and of the copyright. The only apparent defence offered is that he doesn't think that he was breaking the license agreement or doing anything wrong. J.P.M. is an extremely knowledgeable young man in the areas of computers, computer systems and software. He can assemble and modify computer hardware and operate computer software systems such as that with which he ran his bulletin board. It is asking far too much of the Court or any other - any other person aware of the evidence, I feel, to suggest that this knowledgeable young man did not know or understand that what he was doing was illegal. It is significant that the copyright commercial programs were kept by him in a separate restricted area identified as Hacker's Delight available only to persons granted special status and were not - where any caller would become aware of them without J.P.M's permission."

The appellant raises the following ground of appeal: "Did the learned trial judge err in concluding that the Crown had proven its case beyond a reasonable doubt?" Specifically, it is submitted by the appellant that the Crown did not prove that the appellant "distributed" the copyrighted material, that the appellant had the requisite knowledge, or that the distribution was to an extent that it prejudicially affected the owners of the copyrights.

The appellant refers to the definition of "distribute" in **Black's Law Dictionary** and argues that the appellant did not distribute the copyrighted material by placing it in a restricted area of the bulletin board in a "scrambled" format. The definitions of "distribute" and "distribution" relied on are:

a)      to deal or divide out in proportion or in shares

b)      the giving out or division among a number, sharing or parcelling out, allotting, dispensing, apportioning

Since computer programs are expressly protected by the **Act** as literary works, and the owners of the copyrights have the sole right to communicate the work to the public by telecommunication, there can be no doubt that the appellant created infringing copies of

the software by placing them on the bulletin board in such a way that they were available to be used and copied by the 16 "special" users.

It is also clear that when he accessed his computer by modem from his friends' homes and downloaded the programs onto their computers, he was "distributing" the infringing copies.

Furthermore, by controlling the means and manner by which the users of the bulletin board accessed area 20, and providing the software to assist in the downloading by modem by those users, the appellant was also distributing, that is giving out, or sharing the infringing copies. Although it is suggested that the programs were "scrambled" so that they could not be copied or downloaded by the callers, the evidence accepted by the trial judge was that they were "packaged" or "compressed" for efficient storage and "ease of transmission".

The second and third points raised concern the findings of the trial judge regarding the knowledge of the appellant and the extent to which the owners of the copyrights were prejudiced. These are both questions of fact upon which there was evidence presented. The sufficiency of that evidence is a matter for the trial judge. (**R. v. Kent** (1994), 92 C.C.C. (3d) 344 (S.C.C.)). There is no error on the part of the trial judge in law or in its application to the facts. After carefully reviewing the evidence it cannot be said that the verdict was unreasonable or not supported by the evidence and accordingly the appeal should be dismissed.

Roscoe, J.A.

Concurred in:

Freeman, J.A.

Flinn, J.A.

1996 CanLII 8701 (NS CA)

**APPENDIX "A"**

**1995**                                                      **CAC NO. 121549**


**IN THE NOVA SCOTIA COURT OF APPEAL**

on appeal from

**THE YOUTH COURT**


**HER MAJESTY THE QUEEN**

versus

**J. P. M.**


**HEARD BEFORE:**     The Honourable Judge W. J. C. Atton

**PLACE HEARD:**      Halifax Provincial Youth Court

**DATES HEARD:**      June 22, 1995
                     August 14, 1995
                     August 15, 1995
                     August 16, 1995
                     August 17, 1995
                     October 6, 1995

**COUNSEL:**          Kevin A. Burke, Q.C., Defence Counsel
                     David M. Meadows, Crown Counsel


**CASE ON APPEAL**
**TRANSCRIPT**

**VOL. II**

1996 CanLII 8701 (NS CA)

C.A.C. No. 121549

NOVA SCOTIA COURT OF APPEAL

**BETWEEN:**

J. P. M.

Appellant

**- and -**

HER MAJESTY THE QUEEN

Respondent

REASONS FOR
JUDGMENT BY:

ROSCOE, J.A.

1996 CanLII 8701 (NS CA)

# EXHIBIT 3

Copyright © King's Printer,
Victoria, British Columbia, Canada

**Licence**
**Disclaimer**

This Act is current to April 9, 2024

See the Tables of Legislative Changes for this Act's legislative history, including any changes not in force.

# INFANTS ACT

## [RSBC 1996] CHAPTER 223

### *Contents*

**Part 1 — Duties and Obligations of Public Guardian and Trustee**

1  Definition

2  Public Guardian and Trustee may apply to court

3  Contents of petition

4  Transfer

5  Application of proceeds

6  Disposition not to change rights

7  Procedure if property is subject to encumbrance

8  Power to prevent sales of land to prejudice of infants

9  Disabled plaintiff

10  Costs of proceedings by Public Guardian and Trustee

11  Repealed

12  Public Guardian and Trustee has powers for maintenance and education

13  Use of money in court for infant's benefit

14  Use of trust money for infant's benefit

15  Solicitor's costs

16  Termination of guardianship

**Part 2 — Medical Treatment**

17  Consent of infant to medical treatment

**Part 3 — Infants' Contracts**

18  Definition for Part

19  When infants' contract enforceable

19.1  Student loan agreement enforceable against infant

20  Application for relief

21  Application for capacity

22  Application to Public Guardian and Trustee

23  Guarantees and indemnity

24  Other rights

25  Liability in tort

26  Notice to affirm or repudiate

27  Repudiation generally

**Part 4 — General**

28   Domicile of infant

29-31   Repealed

32   Leases: renewal for benefit of infant

33   Charges for renewal

34   New leases to be on same terms

35   Renewal of leases by infants

36   Lease of land belonging to infants

37   Renewal of leases if person bound to renew out of jurisdiction

38   Duties before renewal signed

39   Renewal: if money to go

40   Power of guardian to enter into agreements

41   Application

42   If Public Guardian and Trustee refuses consent

43   Payment to infant at age 19

44   Effect of dispositions made under Act

45   Income from securities

46   Costs may be directed to be paid

47   Contingent remainders to posthumous children

48   Service if proceeding brought against infant

49   Notice of proceeding to Public Guardian and Trustee

50   Repealed

51   If child has no guardian

# Part 1 — Duties and Obligations of Public Guardian and Trustee

**Definition**

**1**   In this Act, **"court"** means the Supreme Court.

**Public Guardian and Trustee may apply to court**

**2**  (1)   The Public Guardian and Trustee may petition the court on behalf of infants who possess or are entitled to land in British Columbia for an order to dispose of all or part of the land.

(2)   The court may proceed in a summary manner on affidavits to inquire into the merits of the application.

(3)   The court may order that a disposition of the land be made by the Public Guardian and Trustee in the manner and with the restrictions the court believes appropriate if the court

(a)   is of the opinion that the disposition is expedient, necessary or proper in the interests of the infant or for the infant's maintenance or education, or

    (b) is satisfied that part of the land is wasting, dilapidating or depreciating from any cause and the infant's interest requires the disposition or will be substantially promoted by the disposition.

## Contents of petition

**3** (1) The petition must state

    (a) the nature and amount of property, other than land, if any, to which the infant is entitled, and

    (b) the necessity for resorting to the land, its nature, value, and the annual net revenue from it.

(2) The petition must

    (a) designate the land proposed to be disposed of,

    (b) propose a scheme for that purpose and for the disposition of the proceeds, and

    (c) state specifically the relief desired and circumstances sufficient to justify the disposition of the land and the proposed application of the proceeds.

## Transfer

**4** (1) Each disposition made by the Public Guardian and Trustee under an order made under section 2 (3) is as effectual as if the infant had executed it and had been of the age of 19 years at the time.

(2) It is not necessary in the transfer to recite any part of the proceedings, but the transfer must briefly refer to the order.

## Application of proceeds

**5** The money arising from the disposition must be applied and disposed of in a manner the court directs.

## Disposition not to change rights

**6** (1) A disposition does not give to the infant any other or greater interest in the proceeds of the disposition than the infant had in the property disposed of.

(2) The heirs, next of kin, or other representatives of the infant have the same interest in any surplus of the proceeds that remains at the death of the infant as they would have had in the land disposed of as if the disposition had not been made.

## Procedure if property is subject to encumbrance

**7** (1) If land of an infant is subject to an uncertain encumbrance, and the person entitled to the encumbrance consents in writing to accept in place of the encumbrance a sum of money that the court thinks reasonable, or the

permanent investment of a reasonable sum of money in a manner that the interest is made payable to the person entitled to the encumbrance during the person's life, the court may direct payment of the sum or the investment of the other sum of money out of the proceeds of the disposition of the land.

(2) If land of an infant is subject to a lien or encumbrance of uncertain duration, the court may

    (a) compute its reasonable value,

    (b) order a disposition of the land of the infant discharged from the lien or encumbrance, and

    (c) direct the payment of the value of the lien or encumbrance out of the proceeds of the disposition.

**Power to prevent sales of land to prejudice of infants**

**8** (1) If it appears to the Public Guardian and Trustee that there are grounds for believing that a disposition of land in which an infant is interested is being made or is about to be made by a personal representative or other person to the prejudice of the infant, the Public Guardian and Trustee may lodge a caveat with the proper registrar of titles prohibiting any dealing with or registration affecting the land until

    (a) an order of the court is obtained approving of the disposition, or

    (b) the caveat is withdrawn or otherwise discharged.

(2) The Public Guardian and Trustee may

    (a) take the steps the Public Guardian and Trustee considers necessary to protect the infant, and

    (b) attend at a hearing before the court.

(3) On the application of the Public Guardian and Trustee, the court may make the order considered necessary to protect the interests of the infant.

**Disabled plaintiff**

**9** If a notice to proceed has been delivered to the Public Guardian and Trustee under section 20 or 26 of the *Limitation Act* and it appears to the Public Guardian and Trustee that the guardian to whom that notice was delivered is failing to take reasonable steps to protect the interests of the disabled plaintiff or is otherwise acting to the prejudice of the disabled plaintiff, the Public Guardian and Trustee must

    (a) investigate the circumstances stated in the notice and out of which the claim may arise or be claimed to arise, and

    (b) commence and maintain a proceeding for the benefit of the disabled plaintiff if the Public Guardian and Trustee believes that the

proceeding would have a reasonable prospect of succeeding and
would result in a judgment that would justify commencing it.

**Costs of proceedings by Public Guardian and Trustee**

**10**  The court may direct that the costs of

> (a)  a proceeding commenced by the Public Guardian and Trustee, or
>
> (b)  a proceeding in which it is necessary or expedient for the Public
> Guardian and Trustee to attend

be taxed and paid either out of the estate of the infant or by any other person who
is a party to the proceeding.

**Repealed**

**11**  [Repealed RS1996 (Supp)-223-2.]

**Public Guardian and Trustee has powers for maintenance and education**

**12**  If the Public Guardian and Trustee is the property guardian of an infant, the Public
Guardian and Trustee may, for any money or other property of the infant held by the
Public Guardian and Trustee or to the Public Guardian and Trustee's account,
exercise for the benefit of the infant the powers conferred on trustees by section 24
of the *Trustee Act* and, without obtaining leave of the court, by section 25 of that Act.

**Use of money in court for infant's benefit**

**13**  (1)  The Public Guardian and Trustee, in the Public Guardian and Trustee's sole
discretion, may authorize payment of all or part of the money in court to the
credit of an infant for the infant's maintenance, education or benefit.

(2)  Subsection (1) applies despite the terms, governing the money in court, of an
agreement, settlement, compromise or other arrangement, or of an order of the
court, other than an order of the court on appeal under subsection (3).

(3)  An infant, without the appointment of a guardian for the appeal, or any person
on an infant's behalf, in a summary manner on 10 days' notice in writing to the
Public Guardian and Trustee, may appeal to the court against an order, or the
refusal to make an order, under subsection (1) or section 14 (1).

**Use of trust money for infant's benefit**

**14**  (1)  If the Public Guardian and Trustee holds money in trust for an infant, the Public
Guardian and Trustee may authorize payment of all or part of the money for the
maintenance, education or benefit of the infant.

(2)  Subsection (1) is subject to the terms of a will or trust deed, if any, that
establishes specific terms for the trust.

**Solicitor's costs**

**15**  If the Public Guardian and Trustee employs a barrister or solicitor in a proceeding about the property of an infant, the barrister or solicitor is entitled to receive from the infant's property, through the Public Guardian and Trustee, or otherwise, costs for the barrister's or solicitor's services that are usually allowed in a proceeding of a similar nature in the court.

**Termination of guardianship**

**16**  (1)  Subject to subsection (3), on termination of the Public Guardian and Trustee's guardianship of a ward because of the ward reaching 19 years of age, the Public Guardian and Trustee, after deducting any commission and settling the claims and liability of the property arising or accruing due before the ward's majority, must

   (a)  pay or transfer the property of the ward to the ward on receiving the ward's release, or

   (b)  if the ward requests, pass the Public Guardian and Trustee's accounts as a guardian under the Supreme Court Civil Rules.

(2)  On termination of the Public Guardian and Trustee's guardianship of an infant for any other reason, the Public Guardian and Trustee, after deducting any commission, must pass the Public Guardian and Trustee's accounts under the Supreme Court Civil Rules.

(3)  If a ward

   (a)  who was, until reaching 19 years of age, in the continuing custody of the director under the *Child, Family and Community Service Act* and had the Public Guardian and Trustee acting as property guardian,

   (b)  who was, until reaching 19 years of age, under the property guardianship of the Public Guardian and Trustee under section 51 of the *Infants Act*, or

   (b.1)  who was, until reaching 19 years of age, under the property guardianship of the Public Guardian and Trustee in accordance with an agreement entered into under section 51.1 of the *Child, Family and Community Service Act*

reaches 19 years of age and enters into an agreement with the Public Guardian and Trustee under section 6 (b) (v) of the *Public Guardian and Trustee Act*, subsection (1) does not apply until the earlier of the following:

   (c)  the date the former ward terminates that agreement;

   (d)  the date the former ward reaches 27 years of age.

# Part 2 — Medical Treatment

**Consent of infant to medical treatment**

**17** (1)  In this section:

> **"health care"** means anything that is done for a therapeutic, preventive, palliative, diagnostic, cosmetic or other health related purpose, and includes a course of health care;

> **"health care provider"** includes a person licensed, certified or registered in British Columbia to provide health care.

(2) Subject to subsection (3), an infant may consent to health care whether or not that health care would, in the absence of consent, constitute a trespass to the infant's person, and if an infant provides that consent, the consent is effective and it is not necessary to obtain a consent to the health care from the infant's parent or guardian.

(3) A request for or consent, agreement or acquiescence to health care by an infant does not constitute consent to the health care for the purposes of subsection (2) unless the health care provider providing the health care

>> (a) has explained to the infant and has been satisfied that the infant understands the nature and consequences and the reasonably foreseeable benefits and risks of the health care, and

>> (b) has made reasonable efforts to determine and has concluded that the health care is in the infant's best interests.

## Part 3 — Infants' Contracts

### Definition for Part

**18**  In this Part, **"contract"** includes an executed and an executory contract.

### When infants' contract enforceable

**19** (1) Subject to this Part, a contract made by a person who was an infant at the time the contract was made is unenforceable against the person unless it is

>> (a) a contract specified under another enactment to be enforceable against an infant,

>> (b) affirmed by the infant when the infant reaches the age of majority,

>> (c) performed or partially performed by the infant within one year after the infant attains the age of majority, or

>> (d) not repudiated by the infant within one year after the infant reaches the age of majority.

(2) A contract that is unenforceable against an infant under subsection (1) is enforceable by an infant against an adult party to the contract to the same extent as if the infant were an adult at the time the contract was made.

### Student loan agreement enforceable against infant

**19.1** (1)  In this section, **"student loan agreement"** means an agreement in writing between a person and the government setting out the terms and conditions

    (a)  on which the government agrees to lend money to the person to enable the person to attend a post-secondary institution, or

    (b)  on which a loan described in paragraph (a) is to be repaid,

and includes amendments to the agreement.

(2)  A student loan agreement that a person who is an infant enters into is enforceable by and against the person to the same extent as if the infant were an adult at the time the agreement was entered into.

## Application for relief

**20** (1)  If a contract is unenforceable against an infant under section 19 (1),

    (a)  the infant, or

    (b)  if the infant has repudiated or is in breach of the contract, another party to the contract,

may apply to a court of competent jurisdiction for relief against

    (c)  a party to the contract, or

    (d)  subject to subsection (5), any person who has acquired a right to or interest in property transferred under the contract.

(2) In an application under subsection (1), the court may order that

    (a)  compensation be paid by or to any of the parties to the contract,

    (b)  there be restitution of property,

    (c)  the parties to the application be discharged from further obligations under the contract or with respect to property transferred under the contract, or

    (d)  compensation be paid to a person, not a party to the contract, who has been ordered to make restitution of property.

(3) Before making an order under subsection (2), the court must consider

    (a)  the circumstances surrounding the making of the contract,

    (b)  whether the infant induced any person to enter into the contract by misrepresenting the infant's age,

    (c)  the subject matter and nature of the contract,

    (d)  in the case of a contract relating to property, the nature and value of the property,

    (e)  the age and means of the infant,

    (f)  whether any party to the application has so changed the party's position that it would be unfair or inequitable to make an order against

the party, and

    (g)  any other relevant circumstances.

(4) For the purposes of subsection (3) (b), an infant does not induce a person to contract with the infant on the basis of a misrepresentation as to the infant's age

    (a)  if the person to whom the misrepresentation was made did not have reasonable grounds for believing that the misrepresentation was true, or

    (b)  merely because the infant signed or otherwise adopted a document relating to the transaction that

        (i)  contained a statement that the infant was 19 years of age or otherwise had contractual capacity,

        (ii)  was prepared and tendered by or on behalf of the other person, and

        (iii)  was prepared and used by the other person in similar transactions.

(5) If property has been transferred under a contract that is unenforceable against an infant under section 19 (1), relief must not be given under this section against a person who has acquired a right to or interest in the property if

    (a)  that person is not a party to the contract, and

    (b)  the property had been transferred in good faith and for value

        (i)  to that person, or

        (ii)  to any of the person's predecessors in title who was not a party to the contract.

(6) A disposition of property or a grant of security or other interest in property made under a contract that is unenforceable against an infant under section 19 (1) is effective to transfer the property or interest, unless and until an order respecting that transfer is made under subsection (2).

**Application for capacity**

**21** (1) On an application on behalf of an infant, the court may make an order granting to the infant

    (a)  full capacity, or

    (b)  capacity to enter into a contract or class of contract specified in the order.

(2) The court must not make an order under subsection (1) unless the court is satisfied that the order is for the benefit of the infant and that, having regard to the circumstances of the infant, the infant is not in need of the protection offered by law to infants in matters relating to contracts.

(3) Section 19 (1) does not apply to a contract made by an infant in accordance with an order made under subsection (1).

(4) Unless the court otherwise orders, notice in writing of an application under subsection (1) must be served on the Public Guardian and Trustee and the guardian of the infant, other than the litigation guardian, not less than 10 days before the date of the hearing of the application.

**Application to Public Guardian and Trustee**

**22** (1) The Public Guardian and Trustee may, on an application made on behalf of an infant, make an order granting contractual capacity or ratifying a specific contract that the infant proposes to enter into or has entered into, if the Public Guardian and Trustee considers that the making of such an order would be in the interest of the infant.

(2) Before making an order under subsection (1), the Public Guardian and Trustee must consider

(a) the nature, subject matter and terms of the contract,

(b) the requirements of the infant, having regard to the infant's particular circumstances,

(c) the age and means of the infant, and

(d) the wishes of the infant's parent or guardian.

(3) Section 19 (1) does not apply to a contract made by an infant in accordance with an order made under subsection (1).

(4) An action must not be brought against the Public Guardian and Trustee arising out of the making of an order under subsection (1).

(5) If, on an application under subsection (1), the Public Guardian and Trustee refuses to grant capacity or ratify a contract in respect of which the application was made, an application for review on behalf of the infant may be made to the court, and the court may make any order that the Public Guardian and Trustee could have made under subsection (1).

**Guarantees and indemnity**

**23** A person who enters into a guarantee or an indemnity, or who otherwise undertakes to be responsible for the failure of an infant to carry out a contractual obligation, is bound by that guarantee, indemnity or undertaking even if the contract in respect of which the guarantee, indemnity or undertaking was made is unenforceable against the infant.

**Other rights**

**24** Nothing in this Act

(a) disentitles an infant to any defence that is available to a person of full capacity, or

(b) imposes on an infant, because of the infant's minority, any greater liability than that of a person of full capacity.

**Liability in tort**

25 Nothing in this Act affects the rule of law by which a person is not liable in tort, if the action in tort

(a) is connected with,

(b) arises out of,

(c) was contemplated by, or

(d) is an indirect means of enforcing

a contract that is unenforceable against the person under section 19 (1).

**Notice to affirm or repudiate**

26 (1) An adult party may, by notice in writing given within one year after an infant with whom the adult has entered a contract has reached the age of majority, request that person to affirm or repudiate the contract.

(2) If a person who receives a notice under subsection (1) fails, within 60 days, to affirm the contract, the person is deemed to have repudiated it.

**Repudiation generally**

27 An adult who was an infant at the time of entering a contract is deemed to repudiate the contract if, within one year after reaching the age of majority, the adult

(a) refuses to perform the contract or a material term of it,

(b) has made a claim for relief under section 20, or

(c) gives, or makes reasonable efforts to give, oral or written notice of repudiation to another party to the contract.

## Part 4 — General

**Domicile of infant**

28 The domicile of an infant is,

(a) if the infant usually resides with all of the infant's parents and those parents have a common domicile, that domicile,

(b) if the infant usually resides with one parent only, that parent's domicile,

(c) if the infant usually resides with a person who is not a parent of the infant and that person has guardianship or custody of the infant, that person's domicile, or

(d)  if the infant's domicile cannot be determined under paragraph (a), (b) or (c), the jurisdiction with which the infant has the closest connection.

**Repealed**

**29-31**  [Repealed 2011-25-372.]

**Leases: renewal for benefit of infant**

**32**  (1)  If an infant is or becomes entitled to a lease made or to be made for the life or lives of one or more persons, or for any term of years, it is lawful for the infant, the infant's guardian or another person on the infant's behalf to apply to the court by petition in a summary way.

(2)  By the order of the court, the infant, the infant's guardian or a person appointed by the court in the place of the infant may by deed surrender the lease and accept, in its place and for the benefit of the infant, a new lease of the premises comprised in the lease surrendered for the number of lives or for the term of years as provided in the lease surrendered, or otherwise, as the court directs.

**Charges for renewal**

**33**  Money and other consideration paid by a guardian or other person as a fine, premium or income for the renewal of the lease, and all reasonable incidental charges, is to be paid out of the property of the infant for whose benefit the lease is renewed, or is to be a charge on the leasehold premises, together with interest, as the court directs.

**New leases to be on same terms**

**34**  A renewed lease operates and is liable to the same trusts, charges, encumbrances, dispositions, devices and conditions as the lease surrendered.

**Renewal of leases by infants**

**35**  If a person under 19 years of age might, under a covenant or agreement, if not under disability, be compelled to renew a lease made or to be made for the life or lives of one or more persons, or for any term of years, the infant or the infant's guardian in the infant's name, by the direction of the court by order made on a summary application of the infant, guardian or any person entitled to the renewal, may accept a surrender of the lease and make a new lease of the same premises, for the number of lives, the term or otherwise as the court directs.

**Lease of land belonging to infants**

**36**  (1)  If a person under 19 years of age holds or is entitled to land or to leasehold land for an absolute interest, and it appears to the court to be for the person's benefit that a lease be made of the property for a term of years, to encourage the erection of buildings on the land, to repair buildings on it, to work mines, or to otherwise improve the land, or for farming or other purposes, the infant or the infant's guardian in the infant's name, by the order of the court made on a

summary application of the infant or the infant's guardian, may lease the land or a part of it, to the extent of the infant's interest in it, for the term and subject to the rents and covenants the court directs.

(2) In no case must any fine or premium be taken.

(3) In each case

(a) the best rent that can be obtained, regard being had to the nature of the lease, must be obtained,

(b) the lease and covenants must be settled and approved by the court,

(c) one copy of the lease must be executed by the lessee, and

(d) a copy executed by each party must be deposited for safe custody in a district registry of the court until the infant reaches 19 years of age, with liberty to proper parties to use them, if required, to enforce the covenants in them.

**Renewal of leases if person bound to renew out of jurisdiction**

**37** (1) If a person who, under a covenant or agreement in writing, if within the jurisdiction and subject to the process of the court, might be compelled to execute a renewal of a lease, is not within the jurisdiction or not amenable to the court's process, the court, by order made on the petition of a person entitled to the renewal, whether or not the person is under disability, may direct a person the court thinks proper to accept a surrender of the subsisting lease, and make a new lease in the name of the person who ought to have renewed it.

(2) The court, in its discretion, in the circumstances, may direct an action be brought to establish the right of the party seeking the renewal before an order for a new lease is made.

(3) A lease made under an order referred to in subsection (1) is as valid as if it were made by the person named and the person had been alive and not under any disability.

**Duties before renewal signed**

**38** A renewal lease must not be made under this Act, under a covenant or agreement, unless the fine, if any, and the things, if any, as ought to be paid or performed by the lessee are first paid and performed.

**Renewal: if money to go**

**39** All money received for a lease renewal, after deduction of necessary incidental charges and expenses, must be paid,

(a) if the renewal is by or for an infant, to the infant's guardian, to be disposed of for the infant's benefit, as the court directs, or

(b) if the renewal is made in the name of a person out of or not amenable to the jurisdiction, to the person, in the manner, or into court to the

account, to be disposed of as the court directs.

**Power of guardian to enter into agreements**

**40**  (1)  In subsections (7) and (11), **"order"** means an order of the Provincial Court if the Provincial Court has jurisdiction over the proceeding for recovery of the unliquidated damages.

(1.1)  A guardian may make a binding agreement for an infant,

      (a)  if the agreement involves a consideration not greater than $10 000, with the consent of the Public Guardian and Trustee, or

      (b)  in a case other than one referred to in paragraph (a), with the approval of the court by order made on the petition of a party to the agreement.

(2)  Subsection (1.1) does not apply to an agreement to settle a claim by an infant for unliquidated damages.

(3)  An agreement to indemnify a person as a result of the person making an agreement with another person for an infant is void unless consented to or approved under subsection (1.1).

(4)  If an agreement to settle a claim by an infant for unliquidated damages is proposed before a proceeding for recovery of the unliquidated damages is commenced and the proposed amount is not greater than $50 000, exclusive of interest and costs,

      (a)  a guardian, with the consent of the Public Guardian and Trustee, or

      (b)  the Public Guardian and Trustee

may make a binding agreement for the settlement of the claim.

(5)  If an agreement to settle a claim by an infant for unliquidated damages is proposed before a proceeding for recovery of the unliquidated damages is commenced and the proposed amount is greater than $50 000, exclusive of interest and costs,

      (a)  a guardian of the infant, or

      (b)  the Public Guardian and Trustee,

on receipt of a court order granting approval, may make a binding agreement for the settlement of the claim.

(6)  An application for approval of the court under subsection (5) must be made by application of a party to the proposed agreement.

(7)  If an agreement to settle a claim by an infant for unliquidated damages is proposed after a proceeding for recovery of the unliquidated damages is commenced and the proposed amount is not greater than $50 000, exclusive of interest and costs, a litigation guardian, with the consent of the Public Guardian and Trustee, may consent to an order awarding damages in favour of the infant.

(8) If an agreement to settle a claim by an infant for unliquidated damages is proposed after a proceeding for recovery of the unliquidated damages is commenced and the proposed amount is greater than $50 000, exclusive of interest and costs, a litigation guardian, on receipt of a court order granting approval, may consent to an order awarding damages in favour of the infant.

(9) An application for approval of the court under subsection (8) must be made

(a) to the court in which the proceeding has been commenced, and

(b) by application of a party to the proceeding.

(10) Before a party, other than the Public Guardian and Trustee, applies for approval of the court under subsection (5) or (8), the party must obtain written comments from the Public Guardian and Trustee with respect to the proposed agreement to settle and must provide the written comments to the court.

(11) After a proceeding described in subsection (7) or (8) has been commenced, the litigation guardian, with the consent of the Public Guardian and Trustee, may consent to an order dismissing all or part of the infant's claim.

(12) If the Public Guardian and Trustee makes an agreement or consents to an agreement under this section, the agreement or consent must be signified by the seal of the Public Guardian and Trustee.

## Application

**41** (1) Section 40 does not apply to a lease, surrender or renewal of a lease referred to in sections 32 to 39.

(2) Section 19 does not apply to an agreement entered into in accordance with section 40.

## If Public Guardian and Trustee refuses consent

**42** (1) In this section, **"court"** means the Provincial Court if the Public Guardian and Trustee refuses consent under section 40 (7) or (11) and the Provincial Court has jurisdiction over the proceeding for recovery of the unliquidated damages.

(2) If under section 40 the Public Guardian and Trustee refuses to give consent, or unreasonably delays providing written comments under section 40 (10), a party may on 10 days' notice in writing to the Public Guardian and Trustee apply to the court for approval of the proposed agreement or order, and the court may direct the Public Guardian and Trustee to state the Public Guardian and Trustee's reasons for the refusal or delay.

## Payment to infant at age 19

**43** (1) In this section, **"net funds"** means, in respect of money paid to the Public Guardian and Trustee in trust for an infant, the balance of that money remaining after deduction of

(a) any money paid by the Public Guardian and Trustee under section 13,

(b) any commissions paid or payable under or charges permitted by the *Public Guardian and Trustee Act* and the regulations made under that Act, and

(c) any taxes, levies or other charges paid or payable by the Public Guardian and Trustee in respect of that money.

(2) If, under this Act or any other enactment or under an agreement approved by a court or consented to or approved by the Public Guardian and Trustee, money is paid to the Public Guardian and Trustee in trust for an infant, the net funds and any income from the money must, on application, be paid by the Public Guardian and Trustee to the person for whom the money was held in trust promptly after the later of

(a) the date by which the Public Guardian and Trustee has received proof, satisfactory to the Public Guardian and Trustee,

(i) of the identity of the infant, and

(ii) that the infant has reached the age of 19 years, and

(b) the date set for payment out in the order, enactment, deed or other record under which the money was paid to the Public Guardian and Trustee.

**Effect of dispositions made under Act**

**44** Every surrender and lease, agreement, receipt or disposition granted, accepted or made under this Act is as valid as if the person by whom, or in whose place, or on whose behalf it is granted, accepted or made, had been of full age, and had granted, accepted or made it.

**Income from securities**

**45** (1) In this section, **"stock"** includes any share, fund, annuity or security transferable in books kept by any company or society, and money payable for the discharge or redemption of the security or an interest in it.

(2) The court, by order made on petition of an infant's guardian, or if there is no guardian, by order made in any proceeding in the court, may direct all or part of the dividends due or to become due on stock, or any money substituted by an enactment for stock, to which an infant is beneficially entitled, to be paid to a guardian of the infant or to any other person in the court's discretion, for the maintenance and education or otherwise for the benefit of the infant.

(3) An order under subsection (2) must name the guardian or other person to whom the payment is directed to be made.

**Costs may be directed to be paid**

**46** The court may order the costs and expenses of a petition, order, direction or transfer under this Act be paid and raised out of the land, stock, rents or dividends about which the proceeding is made, in the manner the court thinks proper.

**Contingent remainders to posthumous children**

47  If any property is, by any marriage or other settlement, limited in remainder in trust for the first or other son or a daughter of a named person, with any remainder over to any other person, the person's son or daughter born after the death of his or her parent may take the property so limited to the first or other son, or to the daughter, in the same manner as if born in the lifetime of his or her parent.

**Service if proceeding brought against infant**

48  (1) In a proceeding against an infant, whether resident in British Columbia or not, service of the pleading or petition by which the proceeding was commenced must be made by serving it on a guardian resident in British Columbia.

(2) From the time of service the person served is guardian, for the proceeding, of the infant and must promptly attend to the infant's interests and do the things necessary to protect the infant's interests.

**Notice of proceeding to Public Guardian and Trustee**

49  (1) The court in which the proceeding is brought may direct that the Public Guardian and Trustee be served with a copy of all documents relevant to the proceeding, and in any case an application for leave to take a step in default against an infant must be served on the Public Guardian and Trustee.

(2) The Public Guardian and Trustee may appear and be heard at the proceeding and may be awarded the costs the court considers appropriate.

**Repealed**

50  [Repealed 2011-25-372.]

**If child has no guardian**

51  (1) If a child has no guardian or if the guardian appointed is dead, refuses or is incompetent at law to act,

(a) a director under the *Child, Family and Community Service Act* is the personal guardian of the child,

(b) the Public Guardian and Trustee is the property guardian of the child, or

(c) paragraphs (a) and (b) both apply,

as circumstances require, unless a tribunal of competent jurisdiction otherwise orders.

(2) If a director under the *Child, Family and Community Service Act* is the personal guardian of a child, the director has all the powers that a guardian, as a guardian of the person of a child appointed by will or otherwise, had on May 19, 1917 in England under Acts 12, Charles the Second, chapter 24, and 49 and 50 Victoria, chapter 27, section 4.

(3) If the Public Guardian and Trustee is the property guardian of a child, the Public Guardian and Trustee has all powers that a guardian, as a guardian of the estate appointed by will or otherwise, had over the estate of a child on May 19, 1917 in England under Acts 12, Charles the Second, chapter 24, and 49 and 50 Victoria, chapter 27, section 4.

Copyright © King's Printer, Victoria, British Columbia, Canada

# EXHIBIT 4

Copyright © King's Printer,
Victoria, British Columbia, Canada

**Licence**
**Disclaimer**

This Act is current to April 9, 2024

See the Tables of Legislative Changes for this Act's legislative history, including any changes not in force.

# AGE OF MAJORITY ACT

## [RSBC 1996] CHAPTER 7

### *Contents*

1 Age of majority
2 References to age in court orders
3 Existing rights preserved
4 Definition of "minor"
5 Accumulations in deed, will or instrument
6 Repealed
7 Incorporation of enactment in deed, will or instrument

**Age of majority**

**1** (1) From April 15, 1970,

    (a) a person reaches the age of majority on becoming age 19 instead of age 21, and

    (b) a person who on that date has reached age 19 but not 21 is deemed to have reached majority on that date.

(2) Subsection (1) applies for the purposes of

    (a) any rule of law, and

    (b) in the absence of a definition or of an indication of a contrary intention, for the interpretation of **"full age"**, **"infant"**, **"infancy"**, **"minor"**, **"minority"** and similar expressions in

        (i) an enactment whenever enacted, and

        (ii) a deed, will or other instrument of whatever nature, not being an enactment, made on or after April 15, 1970.

(3) The use of the words or similar expressions referred to in subsection (2) does not in itself indicate a contrary intention under that subsection, without some further indication of a contrary intention.

(4) In an enactment other than this Act, a reference to age 21 must be read as a reference to age 19.

(5) The Lieutenant Governor in Council may, by order, amend an enactment or bylaw of a local government passed on or before April 15, 1970, by substituting a reference to age 19 for a reference to age 21.

(6) An amendment may be made applicable to a class of enactment or bylaw.

(7) Despite any rule of law, a will or codicil executed before April 15, 1970 is deemed, for the purposes of this Act, not to have been made on or after that date only because the will or codicil is confirmed by a codicil executed on or after that date.

## References to age in court orders

**2** (1) In an order or direction of a court made before April 15, 1970 a reference to age 21 or to an age between 19 and 21, or to any of the expressions referred to in section 1 (2), must be read as a reference to age 19 unless a contrary intention is indicated.

(2) The use of the phrase "21 years" in an order does not in itself indicate a contrary intention under subsection (1) without some further indication of a contrary intention.

## Existing rights preserved

**3** This Act does not prejudice a right of action or a defence to an action that is based on the age of a party and that was in existence at the time the cause of action arose, and the law that was in force immediately before April 15, 1970 applies despite this Act.

## Definition of "minor"

**4** A person who has not reached the age of majority may be described as a minor instead of as an infant, and **"minor"** means such a person.

## Accumulations in deed, will or instrument

**5** This Act does not invalidate a direction for accumulation expressed in a settlement or other disposition made by deed, will or other instrument and executed before April 15, 1970 that, but for this Act, was a permissible period of accumulation.

## Repealed

**6** [Repealed 2012-13-33.]

## Incorporation of enactment in deed, will or instrument

**7** This Act does not affect the interpretation of an enactment that is incorporated in and has effect as part of a deed, will or other instrument, the interpretation of which is not affected by section 1.

Copyright © King's Printer, Victoria, British Columbia, Canada